# EXHIBIT A

**IN THE COMMON PLEAS COURT OF CLERMONT COUNTY, OHIO
GENERAL DIVISION**

VILLAGE OF NEW RICHMOND
102 Willow Street
New Richmond, Ohio 45157

      Plaintiff,

    v.

3M COMPANY
3M Center
St. Paul, Minnesota 55144

E. I. DUPONT DE NEMOURS AND COMPANY
974 Centre Road
Wilmington, Delaware 19805

THE CHEMOURS COMPANY
1007 Market Street
Wilmington, Delaware 19899

THE CHEMOURS COMPANY FC, LLC
1007 Market Street
Wilmington, Delaware 19899

DUPONT DE NEMOURS, INC.
974 Centre Road, Building 730
Wilmington, Delaware 19805

CORTEVA, INC.
974 Centre Road
Wilmington, Delaware 19805

TYCO FIRE PRODUCTS LP
1400 Pennbrook Parkway
Lansdale, Pennsylvania 19446

CHEMGUARD, INC.
2300 Aerial Drive
Marinette, WI 54143

JOHNSON CONTROLS INTERNATIONAL, PLC
One Albert Quay
Cork, Ireland

CENTRAL SPRINKLER, LLC
1400 Pennbrook Parkway
Lansdale, Pennsylvania 19446

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)



# JUDGE BROCK

Case No. CaseNumber

**COMPLAINT WITH JURY DEMAND**

FIRE PRODUCTS GP HOLDING, LLC )
5757 N Green Bay Ave. )
Milwaukee, Wisconsin 53209 )
)
KIDDE PLC, INC. )
9 Farm Springs Road )
Farmington, Connecticut 06032 )
)
CHUBB FIRE, LTD. )
Littleton Road, Ashford )
Middlesex, United Kingdom TW15 1TZ )
)
UTC FIRE & SECURITY AMERICAS )
CORPORATION, INC. )
13995 Pasteur Blvd. )
Palm Beach Gardens, Florida 33418 )
)
RAYTHEON TECHNOLOGIES CORPORATION )
870 Winter Street )
Waltham, Massachusetts 02451 )
)
CARRIER GLOBAL CORPORATION )
13995 Pasteur Blvd. )
Palm Beach Gardens, Florida 33418 )
)
NATIONAL FOAM, INC. )
141 Junny Road )
Angier, North Carolina 27501 )
)
ANGUS INTERNATIONAL SAFETY GROUP, )
LTD )
Station Road, High Bentham )
Near Lancaster, United Kingdom )
)
BUCKEYE FIRE EQUIPMENT COMPANY )
110 Kings Road )
Mountain, North Carolina 28086 )
)
ARKEMA, INC. )
900 1st Avenue )
King of Prussia, Pennsylvania 19406 )
)
BASF CORPORATION )
100 Park Avenue )
Florham Park, New Jersey 07932 )
)
CHEMDESIGN PRODUCTS, INC. )
2 Stanton Street )
Marinette, Wisconsin 54143 )
)
DYNAX CORPORATION )
103 Fairview Park Drive )

Elmsford, New York 10523 )
                                                          )
                                                          )
CLARIANT CORPORATION                                      )
4000 Monroe Road                                          )
Charlotte, North Carolina 28205                           )
                                                          )
CHEMICALS INCORPORATED                                    )
12321 Hatcherville Road                                   )
Baytown, Texas 77521                                      )
                                                          )
NATION FORD CHEMICAL COMPANY                              )
2300 Banks Street                                         )
Fort Mill, South Carolina 29715                           )
                                                          )
AGC, INC.                                                 )
1-5-1, Marunouchi, Chiyoda-ku                             )
Tokyo 100-8405 Japan                                      )
                                                          )
AGC CHEMICALS AMERICAS, INC.                              )
55 E. Uwchlan Avenue, Suite 201                           )
Exton, Pennsylvania 19341                                 )
                                                          )
DEEPWATER CHEMICALS, INC.                                 )
196122 E County Road 40                                   )
Woodward, Oklahoma 73801                                  )
                                                          )
ARCHROMA MANAGEMENT, LLC                                  )
Neuhofstrasse 11, 4153 Reinach                            )
Basel-Land, Switzerland                                   )
                                                          )
ARCHROMA U.S., INC.                                       )
5435 77 Center Dr., #10                                   )
Charlotte, North Carolina 28217                           )
                                                          )
JOHN DOE DEFENDANTS 1-49,                                 )
                                                          )
            Defendants.                                   )
                                                          )
_____                 )

## **COMPLAINT**

Plaintiff, Village of New Richmond ("Plaintiff"), by and through its undersigned

counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and

Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours Company,

The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard,

Inc., Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), Johnson Controls International, plc, Central Sprinkler, LLC, Fire Products GP Holding, LLC, Kidde PLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), National Foam, Inc., Angus International Safety Group, Ltd., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, Nation Ford Chemical Company, AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      Plaintiff brings this action against Defendants to recover any and all past and future compensatory and/or consequential damages for the investigation, remediation, treatment, removal, disposal, and/or monitoring of the ongoing contamination of its water resources, including its water supply, water treatment facilities, and/or other lands, facilities and properties caused and/or created by Defendants' products, as well as any and all other damages available as a result of the actions and/or inactions of Defendants.

2.      Plaintiff owns and operates two Ohio Public Drinking Water Systems, OH1301212 and OH1330912.

3.      Plaintiff supplies water to its customers in the New Richmond Village system (OH1301212) from Plaintiff's groundwater wells located in the Ohio River Sand and

Gravel Aquifer. Plaintiff purchases water from the Clermont County Water System to provide water for Plaintiff's Robin Grays Public Water System (OH1330912).

4.    Plaintiff has a property interest in the water it appropriates, treats, stores, purchases, and distributes to the public, as well as its wellfield, groundwater wells, water sources, water supply, piping, distribution system, treatment system, lands, properties, and facilities (collectively, "Plaintiff's Property").

5.    Per- and polyfluoroalkyl substances ("PFAS") are a large group of manufactured chemicals that have been used in products around the world since about the 1940s.

6.    Plaintiff's Property has been, and continues to be, contaminated with PFAS.

7.    There are thousands of different PFAS, two of which are perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

8.    PFOA and PFOS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil, surface water, and groundwater, and pose a significant risk to human health and safety.

9.    At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold PFOA and/or PFOS, the chemical precursors of PFOA and/or PFOS, and/or products containing PFOA, PFOS, and/or their chemical precursors (collectively, "Fluorosurfactant Products"), and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products.

10.    Defendants' Fluorosurfactant Products include, but are not limited to, Teflon, Scotchguard, waterproofing compounds, stainproofing compounds, paper and cloth coatings, waxes, aqueous film-forming foam ("AFFF"), and various other products.

11.     Defendants designed, manufactured, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment even when used as directed and intended by Defendants.

12.     Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, and/or disposed of at sites located in the vicinity of Plaintiff's Property, including its water sources.

13.     Defendants' Fluorosurfactant Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which allowed PFAS to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property.

14.     As a result of the use of Defendants' Fluorosurfactant Products for their intended purpose, PFAS have been detected in Plaintiff's Property.

15.     Plaintiff's Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

16.     Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for all past and future costs to investigate, treat, filter, remediate, remove, dispose of, and/or monitor the PFAS contamination of Plaintiff's Property caused by the handling, storage, use, or disposal of Defendants' Fluorosurfactant Products at and/or in the vicinity of Plaintiff's Property, as well as any and all other damages recoverable under state and/or applicable federal laws. Plaintiff also seeks damages and restitution for the diminution of value of Plaintiff's Property, as well as punitive damages, pre- and post-judgment interest, and reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in Ohio, or otherwise intentionally avails itself of the Ohio market either through the distribution or sale of products containing PFAS, including but not limited to PFOA and PFOS, in the State of Ohio or by having a headquarters, manufacturing, distribution, or other facility located in Ohio so as to render the exercise of jurisdiction over it by the Ohio courts consistent with traditional notions of fair play and substantial justice.

18.     Venue is appropriate pursuant to Ohio Rules of Civil Procedure 3(C)(5) and (6) because the property, or a portion thereof, that is the subject of this claim for relief is located in Clermont County.

## PARTIES

19.     Plaintiff is Village of New Richmond, a municipal corporation organized and existing pursuant to the laws of the State of Ohio and with its principal place of business at 102 Willow Street, New Richmond, Ohio 45157.

20.     Plaintiff owns and operates multiple public drinking water systems.

21.     Upon information and belief, the following Defendants, at all times relevant to this action, designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products that Defendants knew or reasonably should have known would enter and be released into the environment where they would contaminate Plaintiff's Property, or otherwise conducted or availed themselves of business in the State of Ohio:

a.  Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota. 3M manufactured Fluorosurfactant Products containing PFOA, PFOS, and/or their precursor chemicals. 3M is authorized to conduct business in Ohio.

b.  Defendant E.I. DuPont de Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware. Old DuPont is registered to do business in Ohio.

c.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware. Chemours is registered to do business in Ohio.

d.  Chemours was incorporated as a subsidiary of Old DuPont in February 2014. In 2015, Old DuPont spun off Chemours as a separate corporate entity to hold its "Performance Chemicals" business lines (which included PFAS and numerous products whose manufacture involved the use of PFAS), along with certain of Old DuPont's environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS and the products that contain PFAS.

e. Defendant The Chemours Company FC, LLC ("Chemours FC") is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours. Upon information and belief, Chemours FC is the successor-in-interest to DuPont Chemical Solutions Enterprise. Chemours FC is registered to do business in Ohio.

f. Defendant DuPont De Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and Old DuPont. DowDuPont, Inc. was subsequently divided into three publicly-traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. Upon information and belief, New DuPont has contractually assumed certain of Old DuPont's environmental liabilities, including Old DuPont's PFAS liabilities. Upon information and belief, DowDuPont, Inc. and/or New DuPont have conducted business throughout the United States, including in Ohio.

g. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware. Upon information and belief, Corteva is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have contractually assumed certain of Old DuPont's environmental liabilities, including Old DuPont's PFAS liabilities. Upon information and

belief, Corteva is the parent corporation of Old DuPont. Corteva is authorized to conduct business in Ohio.

h. Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with principal offices located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania. Upon information and belief, Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International, plc, an Irish public limited company. Upon information and belief, Tyco has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

i. Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin. On information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC") in 2010. On information and belief, on or around July 9, 2011, Tyco acquired Chemguard and its subsidiary, WFHC. Upon information and belief, Chemguard has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

j. Defendant Johnson Controls International, plc ("JCI plc") is an Irish public limited company with its principal place of business located at One Albert Quay, Cork, Ireland.

k. Defendant Central Sprinkler, LLC is a Delaware limited liability company with its principal place of business located at 1400 Pennbrook Parkway,

Lansdale, Pennsylvania. Upon information and belief, this Defendant is a limited partner of Tyco. Upon information and belief, Chemguard is wholly-owned by Central Sprinkler, LLC. Upon information and belief, Central Sprinkler, LLC has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

l.  Defendant Fire Products GP Holding, LLC is a Delaware limited liability company with its principal place of business located at 5757 N Green Bay Ave., Milwaukee, Wisconsin 53209. Upon information and belief, this Defendant is a general partner of Tyco. Fire Products GP Holding, LLC is registered to do business in Ohio.

m.  Defendant Kidde PLC, Inc. ("Kidde PLC") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut. Upon information and belief, Kidde PLC was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

n.  Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions including, but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon

information and belief, Chubb has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

o. Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC Fire & Security") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida. Upon information and belief, UTC Fire & Security was a division of United Technologies Corporation. Upon information and belief, UTC Fire & Security has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

p. Defendant Raytheon Technologies Corporation ("RTC") is a Delaware corporation with its principal place of business at 870 Winter Street, Waltham, MA 02451. Upon information and belief, RTC was formerly known as United Technologies Corporation ("UTC") until in or around April 2020 (collectively, "RTC f/k/a UTC"). RTC is registered to do business in Ohio.

q. Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida. On information and belief, on or around April 3, 2020, UTC completed the spin-off of one of its reportable segments into a separate publicly-traded company known as Carrier Global Corporation ("Carrier"). Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security. Upon information and belief, Carrier's Fire & Security products and services are sold under brand names including Chubb and Kidde. Upon information and belief, Carrier has conducted

and/or availed itself of doing business throughout the United States, including in Ohio.

r. Defendant National Foam, Inc. ("NF") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina. NF is a wholly-owned indirect subsidiary of Angus International Safety Group, Ltd. Upon information and belief, NF manufactures the Angus Fire brand of AFFF products. Upon information and belief, NF has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

s. Defendant Angus International Safety Group, Ltd. ("AISG") is a foreign private limited company, United Kingdom registration number 8441763, with offices at Station Road, High Bentham, Near Lancaster, United Kingdom. Upon information and belief, AISG is the parent company of National Foam, Inc.

t. Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina. Buckeye is registered to do business in Ohio.

u. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania. Upon information and belief, Arkema conducted and/or availed itself of doing business throughout the United States, including in Ohio.

v. Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF is authorized to conduct business in Ohio.

w. Defendant ChemDesign Products, Inc. ("CDPI") is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, CDPI manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, CDPI conducted and/or availed itself of doing business throughout the United States, including in Ohio.

x. Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York. Upon information and belief, Dynax manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, Dynax has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

y. Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Upon information and belief, Clariant has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

z. Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas. Upon information and belief, Chem Inc. manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, Chem Inc. has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

aa. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina. Upon information and belief, Nation Ford manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, Nation Ford has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

bb. Defendant AGC, Inc. ("AGC"), formerly known as Asahi Glass Co., Ltd. ("Asahi Glass"), is a Japanese corporation with its principal place of business located at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo, Japan. Upon information and belief, Asahi Glass Co., Ltd. changed its name to AGC, Inc. in 2018.

cc. Defendant AGC Chemicals Americas, Inc. ("AGCCA") is a Delaware corporation with its principal place of business located at 55 E. Uwchlan Ave., Suite 201, Exton, Pennsylvania. Upon information and belief, AGCCA

is a subsidiary of AGC and/or Asahi Glass. AGCCA is registered to do business in Ohio.

dd. Defendant Deepwater Chemicals Company ("Deepwater") is a Delaware corporation with its principal business office at 196122 E County Road 40, Woodward, Oklahoma. Upon information and belief, Deepwater manufactured, formulated, and/or sold Fluorosurfactant Products to certain Defendants for use in Fluorosurfactant Products. Upon information and belief, Deepwater has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

ee. Defendant Archroma Management, LLC ("Archroma") is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

ff. Defendant Archroma U.S., Inc. ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina. Upon information and belief, Archroma U.S. is a subsidiary of Archroma. Upon information and belief, Archroma U.S. has conducted and/or availed itself of doing business throughout the United States, including in Ohio.

gg. Upon information and belief, Defendants John Doe 1-49 were manufacturers and/or sellers of Fluorosurfactant Products that are responsible for the damages caused to Plaintiff described herein. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which

time Plaintiff will move for leave of this Court to add those individuals to the
Complaint as Defendants.

22.     Any and all references to a Defendant or Defendants in this Complaint include
any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the
named Defendant.

23.     When the term "Defendants" is used alone, it refers to all Defendants named
in this Complaint jointly and severally. When reference is made to any act or omission of
the Defendants, it shall be deemed to mean that the officers, directors, agents,
employees, or representatives of the Defendants committed or authorized such act or
omission, or failed to adequately supervise or properly control or direct their employees
while engaged in the management, direction, operation or control of the affairs of
Defendants, and did so while acting within the scope of their employment or agency.

## FACTUAL ALLEGATIONS

### A.     THE CONTAMINANTS

24.     PFOA and PFOS are toxic, persistent, man-made chemicals within a class
known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family
known as PFAS. PFAA is composed of a chain of carbon atoms in which all but one of
the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to
a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that
occur in nature, which is a reason why these molecules are so persistent. PFOA contains
eight carbon-fluorine bonds, which is why it is sometimes referred to as "C8."

25.     PFAAs are sometimes described as long-chain and short-chain, depending
on the number of carbon atoms contained in the carbon chain. PFOA is considered a

long-chain PFAAs because it contains eight carbon atoms in their chains; short-chain PFAAs have six or less carbon atoms in their chains.

26.     PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[1]

27.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[2]

28.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

29.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

30.     According to the United States Environmental Protection Agency ("EPA"), "...studies indicate that exposure to PFOA and PFOS over certain levels may result in...developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney),

---

[1]     EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[2]     EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.

[3]     EPA Doc. Number: 822-R-16-005 (May 2016) at 55; and EPA Doc. Number: 822-R-16-004 (May 2016) at 55.

liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

31.     EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS.[5]

32.     EPA has noted that drinking water can be an additional source of PFOA and PFOS in the body in communities where these chemicals have contaminated water supplies. In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example…an airfield at which [Fluorosurfactant Products] were used for firefighting."[6]

33.     In 2016, EPA issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

34.     On June 15, 2022, EPA issued interim, updated drinking water health advisories of 0.004 ppt for PFOA and 0.02 ppt for PFOS that replace those EPA issued in 2016.[7]

---

[4]     "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Doc. Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[5]     "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[6]     "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Doc. Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[7]     "Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA 822-F-22-002, available at https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan.

35.     On March 14, 2023, EPA announced proposed National Primary Drinking Water Regulations to establish legally enforceable levels, called Maximum Contaminant Levels ("MCLs"), for six PFAS known to occur in drinking water: PFOA, PFOS, perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid (commonly known as "GenX"), perfluorohexane sulfonic acid ("PFHxS"), and perfluorobutane sulfonic acid ("PFBS").[8]

36.     EPA is proposing individual MCLs of 4.0 ppt for PFOA and PFOS, and is proposing to regulate PFNA, HFPO-DA, PFHxS, and PFBS as a mixture, through an approach called a Hazard Index.[9]

## B.     DEFENDANTS' FLUOROSURFACTANT PRODUCTS

37.     PFOA, PFOS, and their chemical precursors are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of in the State of Ohio, including but not limited to nonstick cookware, waterproofing waxes, stain-preventing coatings, and AFFF.

38.     The Fluorosurfactant Products designed, manufactured, marketed, distributed, and/or sold by Defendants contained PFOA, PFOS, and/or their chemical precursors.

39.     When used as the Defendants intended and directed, Defendants' Fluorosurfactant Products release PFAS, including PFOA, PFOS, and/or their chemical precursors, into the environment.

---

[8] EPA, "Fact Sheet: EPA's Proposal to Limit PFAS in Drinking Water March 2023," available at https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_PFAS_NPWDR_Final_4.4.23.pdf.
[9] *Id.*

40.      Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, sediment, surface water and groundwater.

41.      The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their chemical precursors to enter the environment where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the soil, sediment, groundwater, and surface water, including Plaintiff's Property, thereby causing extensive and ongoing damage to Plaintiff and Plaintiff's Property.

42.      Due to the chemicals' persistent nature, among other things, these chemicals have and continue to cause injury and damage to Plaintiff and Plaintiff's Property.

## C.    DEFENDANTS' KNOWLEDGE OF THE HAZARDS OF PFAS

43.      On information and belief, by the early 1980's, Defendants knew or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed or otherwise released in the open environment, per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with surface water and groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

44.      Defendants also knew, or reasonably should have known, that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing

severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS can persist in the body for prolonged periods of time.

45.     In 1980, 3M published data in peer-reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[10]

46.     By the early 1980's, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

47.     In 1981, Old DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. Old DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects – one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[11]

48.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memorandum, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[12]

---

[10]     Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

[11]     Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

[12]     Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

49.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS. Some of 3M's PFOS-based productions, such as its AFFF production, did not fully phase out until 2002.

50.     From 1951, Old DuPont, and on information and belief, Chemours, designed, manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks such as Forafac 1157 and Forafac 1157N, for use in the manufacturing of various Fluorosurfactant Products.

51.     On information and belief, in 2001 or earlier, Old DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the Defendants for use in their Fluorosurfactant Products that were discharged into the environment and contaminated Plaintiff's Property.

52.     Old DuPont had been studying the potential toxicity of PFOA since at least the 1960's and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[13]

53.     By December 2005, the EPA uncovered evidence that Old DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[14] The EPA fined Old DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that

---

[13]     Id., Fred Biddle, "DuPont confronted over chemical's safety," Wilmington News Journal (Apr. 13, 2003). The Wilmington News Journal is published in Wilmington, Ohio.

[14]     $16.5 million.

companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[15]

54.     By July 2011, Old DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over Old DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified Old DuPont of a "probable link" between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[16,17]   By October 2012, the C8 Science Panel had notified Old DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

55.     In July 2015, Old DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly-owned by Old DuPont. By mid-2015, Old DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

56.     Notwithstanding this knowledge, Defendants negligently and carelessly: (a) designed, manufactured, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products; (b) issued

---

[15]     U.S. Environmental Protection Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed January 30, 2018).

[16]     Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

[17]     The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed January 28, 2018).

instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA, PFOS, and/or their precursor chemicals to contaminate Plaintiff's Property; (c) failed to recall and/or warn the users of Fluorosurfactant Products, negligently-designed products containing or degrading into PFOA and PFOS, of the dangers of surface water, soil, sediment, and groundwater contamination as a result of standard use and disposal of these Products; and (d) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew or could reasonably ascertain the identities of the purchasers of their Fluorosurfactant Products.

57.     Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. Defendants also had a duty and breached their duty to minimize the environmental harms caused by Fluorosurfactant Products.

58.     As a direct and proximate result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiff's Property, including its wells, water resources, drinking water, and/or water treatment systems, have been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, treat, filtrate, remove, clean up, correct, and/or remediate PFAS contamination of its Property at significant expense, loss and damage to Plaintiff.

**D. OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM ITS PFAS LIABILITIES**

59.      By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

60.      Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

61.      In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

62.      At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

63.      Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were

appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

64. In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

65. Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

66. Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

67. Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

68. Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

69. Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of

such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

70.     In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

71.     Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiff and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

72.     By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

73.     Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

74.     Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

## E.     THE IMPACT OF PFAS ON THE PLAINTIFF

75.     PFAS have been detected in water extracted from Plaintiff's Property. It is the contention of Plaintiff that any detectible level of PFAS in its wells, water supply, groundwater, and/or elsewhere in its Property requires investigation, treatment, remediation, and monitoring.

76.     The detection and/or presence of PFAS, and the threat of further detection and/or presence of PFAS, in Plaintiff's Property has resulted, and will continue to result, in significant injuries and damage to Plaintiff.

77.     On information and belief, the invasion of Plaintiff's Property with PFAS is recurring, resulting in new harm to Plaintiff on each occasion.

78.     The injuries to Plaintiff caused by Defendants' conduct and Fluorosurfactant Products constitute an unreasonable interference with, and damage to, Plaintiff and Plaintiff's Property. Plaintiff's interests in protecting its Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

### FIRST CAUSE OF ACTION
### Products Liability – Design Defect (Ohio Rev. Code § 2307.75)

79.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs as if fully restated herein.

80.     Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and selling Fluorosurfactant Products.

81.     As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

82.     At the time of manufacture, Defendants knew that the chosen formulation(s) of Fluorosurfactant Products was not biodegradable, would bioaccumulate in humans and wildlife, and was toxic to humans and the environment.

83.     Defendants were also aware and/or in the possession of an available safer design that was functional and reasonably priced.

84.     Defendants represented, asserted, claimed, and warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

85.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants owed a duty to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

86.     Defendants' Fluorosurfactant Products used at or near Plaintiff's Property were used in a reasonably foreseeable manner and without substantial changes in the condition in which they were sold.

87.     Defendants knew, or should have known, that use of Defendants' Fluorosurfactant Products in their intended manner would result in the spillage, discharge, disposal, or release of PFOA, PFOS, and/or their precursor chemicals into the surface water, soil, sediment and groundwater, thereby contaminating natural resources, including water supplies such as Plaintiff's.

88.     Defendants' Fluorosurfactant Products used at or near Plaintiff's Property were defective in design and unreasonably dangerous because, among other things: (a)

PFOA and PFOS cause soil and water contamination, even when used in their foreseeable and intended manner; (b) even at extremely low levels, PFOA and PFOS render drinking water unfit for consumption; (c) PFOA and PFOS pose significant threats to public health; and (d) PFOA and PFOS create real and potential damage to the environment.

89.　At all times relevant herein, the foreseeable risks associated with the design or formulation of Defendants' Fluorosurfactant Products exceeded the benefits associated with their design or formulation. These risks were foreseeable at the time the Fluorosurfactant Products left the control of the manufacturer(s).

90.　At the time of manufacture, there were safer alternative designs that were practical, feasible, cost effective, and advantageous, including not using PFOA, PFOS, and/or their precursor chemicals in their Fluorosurfactant Products. These practical and technically feasible alternative designs or formulations were available at the time the Fluorosurfactant Products left the manufacturer(s) and would have prevented the harm caused to Plaintiff without substantially impairing the usefulness or intended purpose of the products.

91.　Plaintiff was, is and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

92.　The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiff.

93.　The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because PFOA and PFOS contamination is widespread, persistent and toxic.

94.     The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' Fluorosurfactant Products were toxic, could not be contained, and do not readily degrade in the environment.

95.     Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

96.     As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFAS, including but not limited to the investigation, monitoring, treatment, testing, remediation, filtration, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, legal fees and costs, diminution of property value, punitive damages, and all other equitable and applicable damages.

## SECOND CAUSE OF ACTION
### Products Liability – Failure to Warn (Ohio Rev. Code § 2307.76)

97.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs as if fully restated herein.

98.     Defendants were engaged in the business of researching, designing, manufacturing, formulating, testing, distributing, marketing and/or selling Fluorosurfactant Products.

99.     As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by their Fluorosurfactant Products.

100.    Defendants knew, or in the exercise of ordinary care should have known, that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health and the environment.

101.    Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual threat to human health and contamination of the environment by PFOA and PFOS, despite Defendants' knowledge that PFOA and PFOS are a real and potential threat to the environment and human health.

102.    Defendants knew they were providing inadequate warnings and/or instructions about the inherent danger of allowing their Fluorosurfactant Products to be dispersed into the environment whereby through runoff or permeation through the ground PFAS, including PFOS and PFOA, would foreseeably infiltrate soil, surface water, and groundwater resources, including Plaintiff's water supplies.

103.    Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, disposed of, and/or released at or near Plaintiff's Property, including Plaintiff's water supplies.

104. Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the Products were sold.

105. Defendants' Fluorosurfactant Products used at or near Plaintiff's Property were defective in design and due to inadequate warning and were unreasonably dangerous for the reasons set forth above.

106. Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products at or near Plaintiff's Property, including contamination of Plaintiff's Property with PFOA, PFOS, and/or their precursor chemicals, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

107. Defendants failed to act as reasonable manufacturers when presenting their Fluorosurfactant Products to the public. In particular, Defendants failed to take reasonable precautions such as describing such hazards, or providing any precautionary statements regarding such hazards, in the labeling of their Fluorosurfactant Products.

108. Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard of the probable dangerous consequences of their conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

109. As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Plaintiff has

incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFAS, including but not limited to the investigation, monitoring, treatment, testing, remediation, filtration, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, legal fees and costs, diminution of property value, punitive damages, and all other equitable and applicable damages.

## THIRD CAUSE OF ACTION
## Trespass

110.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs as if fully restated herein.

111.    Plaintiff is the owner and operator of a public water supply system and other properties and facilities associated therewith. Defendants knew, or in the exercise of reasonable care should have known, that PFOA and PFOS contaminate water resources, including water resources utilized by and which are the property of public water providers, such as Plaintiff.

112.    Defendants failed to properly warn against the use of Fluorosurfactant Products such that they proximately caused and continue to cause PFOA and PFOS to contaminate Plaintiff's Property, including but not limited to its groundwater.

113.    The contamination of Plaintiff's Property has varied over time and has not yet ceased. PFOA and PFOS continue to migrate into and enter Plaintiff's Property. The contamination is reasonably abatable.

114.    Plaintiff has not consented to, and does not consent to, this trespass.

115.    Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

116.    Plaintiff is, was, and will continue to be harmed by this trespass.

117. Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

118. As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFAS, including but not limited to the investigation, monitoring, treatment, testing, remediation, filtration, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, legal fees and costs, diminution of property value, punitive damages, and all other equitable and applicable damages.

## FOURTH CAUSE OF ACTION
### Negligence

119. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs as if fully restated herein.

120. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of Fluorosurfactant Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

121. Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and

the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA, PFOS, and/or their precursor chemicals to enter and contaminate Plaintiff's Property; (c) failed to recall and/or warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these Products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identities of the purchasers of their Fluorosurfactant Products.

122.     Plaintiff was a foreseeable victim of the harm caused by Defendants' Fluorosurfactant Products.

123.     Defendants thereby failed to exercise reasonable case to prevent their Fluorosurfactant Products from presenting an unreasonable risk to human health and failed to exercise reasonable case to prevent contamination of water supplies, including the Plaintiff's water supply.

124.     Defendants' negligent, reckless, and/or intentional acts and omissions alleged herein contaminated Plaintiff's Property, including its water supply source.

125.     Plaintiff is, was, and will continue to be harmed by Defendants' negligent, reckless, and/or intentional acts and omissions alleged herein.

126.     Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or

omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

127.    As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFAS, including but not limited to the investigation, monitoring, treatment, testing, remediation, filtration, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, legal fees and costs, diminution of property value, punitive damages, and all other equitable and applicable damages.

## FIFTH CAUSE OF ACTION
### Public Nuisance

128.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs as if fully restated herein.

129.    Plaintiff is a public entity and, as such, the water Plaintiff provides to residential and commercial customers is a public and commonly held resource. Members of the public have a right to have their water remain clean, safe, and free of Defendants' Fluorosurfactant Products.

130.    Defendants designed, manufactured, distributed, marketed, and/or sold their Fluorosurfactant Products in a manner that created, or participated in creating, a nuisance that unreasonably and substantially interferes with the use and enjoyment of Plaintiff's Property, and unreasonably endangers or injures the health, safety, and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

131.    The unreasonable and substantial interference with the use and enjoyment of Plaintiff's Property includes but is not limited to: the contamination of Plaintiff's Property, including Plaintiff's water supply source; and the exposure to known toxic chemicals manufactured and/or sold by Defendants.

132.    Defendants have, by their acts and omissions set forth above, among other things, knowingly unleashed long-lasting and ongoing PFAS contamination, and threat of PFAS contamination, upon Plaintiff's Property.

133.    Actual and threatened PFAS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of Plaintiff's Property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

134.    Defendants substantially interfered with and caused damage to a public or common resource that endangered the use of property, was injurious to the public health, and interfered with the reasonable enjoyment of life or property by an entire community.

135.    Defendants knew that the use and introduction of Fluorosurfactant Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's Property.

136.    Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its

reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

137.     As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFAS, including but not limited to the investigation, monitoring, treatment, testing, remediation, filtration, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, legal fees and costs, diminution of property value, punitive damages, and all other equitable and applicable damages.

## SIXTH CAUSE OF ACTION
### Private Nuisance

138.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

139.     Plaintiff is the owner of land, property, and water rights that permit Plaintiff to extract water for use in Plaintiff's water system to provide drinking water to its customers.

140.     Defendants' intentional, negligent, and/or reckless conduct, as alleged in this Complaint, has resulted in the contamination of Plaintiff's Property with PFOA, PFOS, and/or their precursor chemicals and, without intervention by Plaintiff, would render water undrinkable.

141.     Plaintiff, as the owner of its Property comprising its public water supply system and as a purveyor of drinking water, has suffered injuries different in kind from the community at large because Plaintiff relies upon its water supply system for its public service functions.

142.     Defendants' manufacture, distribution, sale, supply, and/or marketing of their Fluorosurfactant Products was unreasonable because Defendants knew, or reasonably should have known, of the dangerous characteristics and properties of PFOA and PFOS, and knew that contamination of public water supplies, such as Plaintiff's, was substantially certain to occur, but failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

143.     The contamination resulting from Defendants' Fluorosurfactant Products substantially and unreasonably interferes with Plaintiff's property rights to appropriate, use, and enjoy water from its Property.

144.     Defendants committed each of the above-described acts and/or omissions knowingly, willfully, and with oppression, fraud, and/or malice. Defendants' acts and/or omissions were performed to promote sales of their Fluorosurfactant Products and with conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment and on public health, safety, and welfare.

145.     As a direct and proximate result of Defendants' above described acts and omissions, all of which are violations of applicable state and/or federal laws, Plaintiff has incurred, and will continue to incur, costs and damages related to the contamination of its Property by PFAS, including but not limited to the investigation, monitoring, treatment, testing, remediation, filtration, removal, and/or disposal of the contamination, operating, maintenance and consulting costs, legal fees and costs, diminution of property value, punitive damages, and all other equitable and applicable damages.

### SEVENTH CAUSE OF ACTION
### Violation of Ohio's Uniform Fraudulent Transfer Act
### (Against UFTA Defendants Only)

146.　　Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs as if fully restated herein.

147.　　Plaintiff seeks equitable and other relief pursuant to the Ohio Uniform Fraudulent Transfer Act ("UFTA"), ORC Chapter 1336 *et seq.*, against Old DuPont, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and New DuPont (collectively, the "UFTA Defendants").

148.　　Pursuant to ORC 1336.04(A), "[a] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

    a. (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

    b. (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

        i. (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

        ii. (b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

149. Further, ORC 1336.04(B) states that, "[i]n determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, [...] whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; whether the transfer was of substantially all of the assets of the debtor; whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

150. By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and/or sale of PFAS. In order to shield its assets from these liabilities, Old DuPont engaged in a complex series of corporate restructurings and spin-offs.

151. In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" division to Chemours.

152. In or around July 2015, Old DuPont spun-off Chemours as a separate public entity. As part of this transaction, Chemours assumed certain of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFAS and Fluorosurfactant Products and agreed to indemnify Old DuPont against all such liabilities.

153. Upon information and belief, at the time of the spinoff, Old DuPont's Performance Chemicals division contained the Fluorosurfactant Products and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division,

Chemours accepted broad assumption of liabilities for Old DuPont's historical use, manufacture, distribution, and sale of Fluorosurfactant Products and/or PFAS.

154.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture and sale of its Fluorosurfactant Products.

155.    Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products described herein.

156.    Upon information and belief, the UFTA Defendants (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

157.    Upon information and belief, the UFTA Defendants engaged in acts in furtherance of a scheme to transfer Old DuPont's assets out of the reach of Plaintiff, and other similar parties, that have suffered injury and been damaged as a result of the UFTA Defendants' conduct, omissions, and actions as described in this Complaint.

158. Upon information and belief, UFTA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and Old DuPont knew, or reasonably should have known, that The Chemours Company would incur debts beyond its ability to pay as they became due.

159. Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, the UFTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liabilities for damages and injuries from the manufacturing, marketing, distribution, and/or sale of Fluorosurfactant Products.

160. Pursuant to ORC 1336 *et seq.*, Plaintiff seeks to avoid the transfer of Old DuPont's liabilities for the claims brought in this Complaint and to hold the UFTA Defendants jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

161. Plaintiff further reserves such other rights and remedies that may be available to it as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Village of New Richmond, prays that this Complaint be received and filed and that, after consideration hereof, the Court enter its Order granting unto Plaintiff the following relief:

1. A judgment against the Defendants, jointly and severally, for all relief prayed for herein;

2. Compensatory damages according to proof including, but not limited to:

a.  costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of the PFAS contamination of Plaintiff's Property caused by Fluorosurfactant Products, including but not limited to that arising from the use of Fluorosurfactant Products;

b.  costs and expenses related to the past, present, and future treatment, remediation, and/or filtration of the PFAS contamination of Plaintiff's Property caused by Fluorosurfactant Products, including but not limited to that arising from the use of Fluorosurfactant Products;

c.  costs and expenses associated with and related to the removal and disposal of the PFAS contamination of Plaintiff's Property caused by Fluorosurfactant Products, including but not limited to that arising from the use of Fluorosurfactant Products;

d.  costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate the PFAS contamination of Plaintiff's Property caused by Fluorosurfactant Products, including but not limited to that arising from the use of Fluorosurfactant Products; and

e.  Costs and expenses related to the past, present, and future monitoring of the impacts of PFAS contamination on its citizens;

3.  Diminution of property value;

4.  Consequential damages;

5.     Punitive damages;

6.     Costs, disbursements, and attorneys' fees of this lawsuit;

7.     Pre-judgment and post-judgment interest; and

8.     Such other and further relief as the Court deems just, proper, and equitable.

DATED: July 10, 2023

Respectfully submitted,

McNamee & McNamee, LLP

 */s/ D. Dale Sief*
D. Dale Seif, Jr. (OH Bar 75924)
2625 Commons Boulevard
Beavercreek, OH 45431
Telephone: (937) 427-1367
Fax: (937) 427-1369
dseif@mcnameelaw.com

Oths, Heiser, Miller, Waigand & Clagg, LLC
Robert R. Miller (OH Bar 0047186)
Sixteen East Broadway, P.O. Box 309
Wellston, Ohio 45692
Telephone: (740) 384-2111
Fax: (740) 384-5632
rmiller@ohlaw.com

Terence R. Coates (0085579)
Jonathan T. Deters (0093976)
Markovits, Stock & DeMarco, LLC
119 East Court Street STE 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
Fax: (513) 665-0210
tcoates@msdlegal.com
jdeters@msdlegal.com

Cossich, Sumich, Parsiola & Taylor, LLC
Brandon J. Taylor* (LA Bar 27662)
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000
Fax: (504) 394-9110
btaylor@cossichlaw.com
*Application for Pro Hac Vice admission pending

ATTORNEYS FOR PLAINTIFF

**2023 CVB 00681 Village of New Richmond vs. 3M Company et al AWB**

Case Type:
CVB - Product Liability
Case Status:
Open
File Date:
07/11/2023
DCM Track:

Action:
Product Liability
Status Date:
07/11/2023
Case Judge:
Brock, Anthony W
Next Event:

All Information | Party | Docket | Financial | Receipt | Disposition

### Docket Information

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
| 07/11/2023 | Complaint with Jury Demand  Receipt: 294837  Date: 07/11/2023 | $130.00 | Image |
| 07/11/2023 | Classification form, filed | | Image |
| 07/11/2023 | Deposit Received (CV)  Receipt: 294837  Date: 07/11/2023 | $120.00 | |
| 07/11/2023 | Clerk's fee for indexing | $25.00 | |
| 07/11/2023 | Deposit Received (CV)  Jury Demand  Receipt: 294837  Date: 07/11/2023 | $300.00 | |
| 07/11/2023 | 19 Additional Defendants over the #12 Limit at $20.00/Defendant  Receipt: 294837  Date: 07/11/2023 | $380.00 | |
| 07/11/2023 | Ex-Parte Motion and Memorandum to Request Additional Time in Which to Request Service of International Defendants Filed CC: to Judge | $1.00 | Image |
| 07/11/2023 | Praecipe for Service: Certified Mail | $1.00 | Image |
| 07/11/2023 | Per Page Fee  Civil case only | $55.00 | |
| 07/12/2023 | Summons and copy of complaint issued | $52.00 | Image |
| 07/12/2023 | Issue Date: 07/12/2023 Service: Summons and Copy of Complaint Method: Certified mail; cv case; return receipt requested Cost Per: $9.00 | $234.00 | |

3M Company
3M Center
St Paul, MN 55144-1000
Tracking No: 7112436946802833938/ 9214890112136000000295841

E I Dupont De Nemours and Company
974 Centre Road
Wilmington, DE 19805
Tracking No: 7112436946802833939/ 9214890112136000000295858

Chemours Company
1007 Market Street
Wilmington, DE 19899
Tracking No: 7112436946802833940/ 9214890112136000000295865

Chemours Company FC LLC
1007 Market Street
Wilmington, DE 19899
Tracking No: 7112436946802833941/ 9214890112136000000295872

Dupont De Nemours Inc
974 Centre Road, Building 730
Wilmington, DE 19805
Tracking No: 7112436946802833942/ 9214890112136000000295889

Corteva Inc
974 Centre Road
Wilmington, DE 19805
Tracking No: 7112436946802833943/ 9214890112136000000295896

Tyco Fire Products LP
1400 Pennbrook Parkway
Lansdale, PA 19446
Tracking No: 7112436946802833944/ 9214890112136000000295902

Chemguard Inc
2300 Aerial Drive
Marinette, WI 54143
Tracking No: 7112436946802833945/ 9214890112136000000295919

Central Sprinkler LLC
1400 Pennbrook Parkway
Lansdale, PA 19446
Tracking No: 7112436946802833946/ 9214890112136000000295926

Fire Products GP Holding LLC
5757 N Green Bay Ave.
Milwaukee, WI 53209
Tracking No: 7112436946802833947/ 9214890112136000000295933

Kidde PLC Inc
9 Farm Springs Road
Farmington, CT 06032
Tracking No: 7112436946802833948/ 9214890112136000000295940

UTC Fire and Security Americas Corporation Inc
13995 Pasteur Blvd.
PALM BEACH GARDENS, FL 33418
Tracking No: 7112436946802833949/ 9214890112136000000295957

Raytheon Technologies Corporation
870 Winter Street
Waltham, MA 02451
Tracking No: 7112436946802833950/ 9214890112136000000295964

Carrier Global Corporation
13995 Pasteur Blvd.
PALM BEACH GARDENS, FL 33418
Tracking No: 7112436946802833951/ 9214890112136000000295971

National Foam Inc
141 Junny Road
Angier, NC 27501
Tracking No: 7112436946802833952/ 9214890112136000000295988

Buckeye Fire Equipment Company
110 Kings Road
MOUNTAIN, NC 28086
Tracking No: 7112436946802833953/ 9214890112136000000295995

Arkema Inc
900 1st Avenue
King of Prussia, PA 19406
Tracking No: 7112436946802833954/ 9214890112136000000296008

| Date | Docket Text | Amount Owed | Image Avail. |
|---|---|---|---|
|  | BASF Corporation<br>100 Park Avenue<br>Florham Park, NJ 07932<br>Tracking No: 71124369468028339955/ 92148901121360000000296015<br><br>Chemdesign Products Inc<br>2 Stanton Street<br>Marinette, WI 54143<br>Tracking No: 71124369468028339956/ 92148901121360000000296022<br><br>Dynax Corporation<br>103 Fairview Park Drive<br>Elmsford, NY 10523<br>Tracking No: 71124369468028339957/ 92148901121360000000296039<br><br>Clariant Corporation<br>4000 Monroe Road<br>CHARLOTTE, NC 28205<br>Tracking No: 71124369468028339958/ 92148901121360000000296046<br><br>Chemicals Incorporated<br>12321 Hatcherville Road<br>Baytown, TX 77521<br>Tracking No: 71124369468028339959/ 92148901121360000000296053<br><br>Nation Ford Chemical Company<br>2300 Banks Street<br>Ft. Mill, SC 29715<br>Tracking No: 71124369468028339960/ 92148901121360000000296060<br><br>AGC Chemicals Americas Inc<br>55 E. Uwchlan Avenue, Suite 201<br>Exton, PA 19341<br>Tracking No: 71124369468028339961/ 92148901121360000000296077<br><br>Deepwater Chemicals Inc<br>196122 E County Road 40<br>WOODWARD, OK 73801<br>Tracking No: 71124369468028339962/ 92148901121360000000296084<br><br>Archroma US Inc<br>5435 77 Center Dr., #10<br>CHARLOTTE, NC 28217<br>Tracking No: 71124369468028339963/ 92148901121360000000296091 |  |  |
| 07/25/2023 | Successful Service (Civil Case)<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served : 07/15/2023<br>Return : 07/25/2023<br>On : 3M Company<br>Signed By : Jason<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339938 | $1.00 | Image |
| 07/27/2023 | Order Granting Ex-Parte Motion To Request Additional Time In Which To Request Service On International Defendants filed | $3.00 | Image |
| 08/02/2023 | CIVIL Failure of service/Requester<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served :<br>Return : 08/02/2023<br>On : Dynax Corporation<br>Signed By :<br><br>Reason : Not deliverable as addressed<br>Comment : Return to Sender, Unable to Forward<br><br>Tracking #: 71124369468028339957 | $3.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served : 07/17/2023<br>Return : 08/08/2023<br>On : E I Dupont De Nemours and Company<br>Signed By : Can't read signature<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339939 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served : 07/19/2023<br>Return : 08/08/2023<br>On : Chemours Company FC LLC<br>Signed By : Nicole Ramsur<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339941 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served : 07/19/2023<br>Return : 08/08/2023<br>On : Chemours Company<br>Signed By : Nicole Ramseur<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339940 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served : 07/17/2023<br>Return : 08/08/2023<br>On : Dupont De Nemours Inc<br>Signed By : Can't read signature<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339942 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served : 07/17/2023<br>Return : 08/08/2023<br>On : Chemguard Inc<br>Signed By : Katy Beekman<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339945 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method : Certified mail; cv case; return receipt requested<br>Issued : 07/12/2023<br>Service : Summons and Copy of Complaint<br>Served : 07/17/2023<br>Return : 08/08/2023 | $1.00 | Image |

| Date | Docket Text | Amount Owed | Image Avail. |
|------|-------------|-------------|--------------|
| | Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339943 | | |
| 08/08/2023 | Successful Service (Civil Case)<br>Method    : Certified mail; cv case; return receipt requested<br>Issued    : 07/17/2023<br>Service   : Summons and Copy of Complaint<br>Served    : 07/17/2023<br>Return    : 08/08/2023<br>On        : Fire Products GP Holding LLC<br>Signed By : mail room<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339947 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method    : Certified mail; cv case; return receipt requested<br>Issued    : 07/17/2023<br>Service   : Summons and Copy of Complaint<br>Served    : 07/17/2023<br>Return    : 08/08/2023<br>On        : Kidde PLC Inc<br>Signed By : John Basile<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339948 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method    : Certified mail; cv case; return receipt requested<br>Issued    : 07/12/2023<br>Service   : Summons and Copy of Complaint<br>Served    : 07/17/2023<br>Return    : 08/08/2023<br>On        : UTC Fire and Security Americas Corporation Inc<br>Signed By : can't read signature<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339949 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method    : Certified mail; cv case; return receipt requested<br>Issued    : 07/12/2023<br>Service   : Summons and Copy of Complaint<br>Served    : 07/18/2023<br>Return    : 08/08/2023<br>On        : Raytheon Technologies Corporation<br>Signed By : Raytheor<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339950 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method    : Certified mail; cv case; return receipt requested<br>Issued    : 07/12/2023<br>Service   : Summons and Copy of Complaint<br>Served    : 07/17/2023<br>Return    : 08/08/2023<br>On        : Carrier Global Corporation<br>Signed By : cna't read signature<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339951 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method    : Certified mail; cv case; return receipt requested<br>Issued    : 07/12/2023<br>Service   : Summons and Copy of Complaint<br>Served    : 07/17/2023<br>Return    : 08/08/2023<br>On        : National Foam Inc<br>Signed By : jame campbell<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339952 | $1.00 | Image |
| 08/08/2023 | Successful Service (Civil Case)<br>Method    : Certified mail; cv case; return receipt requested<br>Issued    : 07/12/2023<br>Service   : Summons and Copy of Complaint<br>Served    : 07/17/2023<br>Return    : 08/08/2023<br>On        : Arkema Inc<br>Signed By : Arkema<br><br>Reason : Successful<br>Comment :<br><br>Tracking #: 71124369468028339954 | $1.00 | Image |